**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **TONNETTE P. TRIPLETT,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **No. 12 C 4382** |
| | ) | |
| **v.** | ) | **Magistrate Judge Cole** |
| | ) | |
| **CAROLYN W. COLVIN[1], Commissioner** | ) | |
| **of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION AND ORDER**

Tonnette Triplett seeks review of the final decision of the Commissioner ("Commissioner")
of the Social Security Administration ("Agency") denying her application for Supplemental Security
Income ("SSI") under Title XVI of the Social Security Act ("Act"). 42 U.S.C. § 1382c(a)(3)(A).
Ms. Triplett asks the court to reverse and remand the Commissioner's decision, while the
Commissioner seeks an order affirming the decision.

**I.
PROCEDURAL HISTORY**

Ms. Triplett applied for SSI on September 22, 2009, alleging that she had become disabled
on September 8, 2008. (Administrative Record ("R.") 121-123). Her application was denied
initially and upon reconsideration. (R. 69-75, 78-81). Ms. Triplett continued pursuit of her claim
by filing a timely request for a hearing.

An administrative law judge ("ALJ") convened a hearing on May 13, 2011, at which Ms.
Triplett, represented by counsel, appeared and testified. (R. 42-68). In addition, Cheryl Hoiseth

---

[1] Pursuant to Federal Rules of Civil Procedure 25(d), we have substituted Carolyn W. Colvin for
Michael J. Astrue as the appellee.

appeared and testified as a vocational expert. (R.42). On May 27, 2011, the ALJ issued a decision finding that Ms. Triplett was not disabled because she retained the capacity to perform work that did not involve complex instructions, concentration for extended periods, or frequent interaction with the public and co-workers, and allowed her to be off task five percent of the time. (R. 26-34). Ms. Triplett filed her request for review past the deadline (R. 6-7) – her excuse was that she was out of town (R. 198) – but the Appeals Council considered it anyway. The ALJ's decision then became the final decision of the Commissioner when the Appeals Council denied Ms. Triplett's request for review of on April 27, 2012. (R. 1-3). *See* 20 C.F.R. §§ 404.955; 404.981. Ms. Triplett has appealed that decision to the federal district court under 42 U.S.C. § 405(g), and the parties have consented to the jurisdiction of a Magistrate Judge pursuant to 28 U.S.C. § 636(c).

## II.
## THE EVIDENCE OF RECORD

### A.
### The Vocational Evidence

Ms. Triplett was born on October 25, 1970, making her forty years old at the time of the ALJ's decision. (R. 121). She quit school after just the tenth grade. (R. 47). Ms. Triplett has a rather limited experience with the working world, having held jobs for just a little over three years of her life. (R. 144). All of her work was part-time. (R. 48). The longest job she held was as a homemaker for a home health care service. (R. 144). She is not married, and claims to have two children, but she may actually have four. (R. 208-09). She is a heroin addict, but is currently on methadone. (R. 202-03). She has also been incarcerated for a drug offense. (R. 202-03).

**B.**
**The Medical Evidence**

Ms. Triplett receives regular, free mental health treatment from the Human Resources Development Institute (HRDI). In her initial psychiatric evaluation there on May 12, 2009, Ms. Triplett reported that she heard voices, felt depressed, thought about suicide, and had difficulty sleeping. (R 202). She had spent nine months in jail on drug charges and had a substance abuse problem in the past. (R. 202-03). She said she was in a methadone program and last used heroine three years earlier, in 2006, as well as cocaine, marijuana, and PCP. (R. 202-03). Her mother had been a drug addict as well. (R. 203). She appeared moderately restless, severely depressed, and her range of mood was restricted. (R. 203). She exhibited thought disorder, paranoia, and auditory hallucinations. (R. 204). Her memory was intact but she had impaired attention and concentration; decreased energy and interest in activities; only fair insight, judgement, and reliability; depressed mood; an inability to perform serial sevens; and distractability. (AR 205). Her Global Assessment of Functioning (GAF) score was just 30-40 (R. 205), denoting some impairment in reality testing or communication (*e .g.,* speech is at times illogical, obscure, or irrelevant) or a major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (*e.g.,* avoids friends, neglects family, and is unable to work). http://www.gafscore.com/. Ms. Triplett was diagnosed with "schizoaffective disorder, depressed [and] heroin addiction."[2] (R. 205).

---

[2] Ms. Triplett's counsel states the assessment diagnosed her with "past heroin addiction." (*Plaintiff's Brief*, at 2). That's simply wrong. Nowhere in the report does the mental health professional make such a diagnosis. Ms. Triplett may have then been off heroin and on methadone at that time, but she will always be an addict, even if she is eventually sober. Mischaracterizations of the record like plaintiff's counsel's do nothing but cast the client's case in a poor light. The hope is that this was merely an error, but it is becoming a bit of a pattern from plaintiff's counsel. *See King v. Colvin*, 2013 WL 3944182, *10 n.2 (N.D.Ill. 2013); *Orienti v. Astrue*, 2013 WL 4008719, *16 (N.D.Ill. 2013); *Khan v. Colvin*, 2013 WL 5700961, *8-9 & n.5 (N.D.Ill. 2013). And always, these "mistakes" seem to coincidentally be in the plaintiff's favor.

Psychiatric notes from July 1, 2009, show Ms. Triplett was "taking [illegible] Seroquel on her own." (R. 207). She was very tense, depressed, and not sleeping well. Her medication was adjusted and she was educated on prescription medication abuse. (R. 201). Two months later, she was said to be stable. (R. 207). She remained stable without complaints through October 8, 2009. (R. 244).

On December 9, 2009, Jeffrey Karr, Ph.D., examined Ms. Triplett for the Agency in connection with her disability application. (R. 208-11). Ms. Triplett was accompanied by her uncle. (R. 208). She claimed that she heard a voice alternating between comforting and warning her. (R. 209). She live in her aunt and uncle's basement, but couldn't say for how long. She said she had two children but didn't know how old they were. She didn't know when she woke up or went to bed. (R. 208). She was completely dependent on others for meals, shopping, laundry, and travel. (R. 208). Contrary to what she had told the people at HRDI a few months earlier, Ms. Triplett denied any history of drug abuse or treatment. (R. 208). She said that the police had tried to get her but would not elaborate. (R. 209).

Contrary to what Ms. Triplett had just told Dr. Karr, her uncle said she lived with her grandmother and had four children. (R. 209). He added that she had no friends, did not currently use alcohol or drugs but had received past treatment for substance use, and would stare at television. (R. 209). He noted that his niece regularly attended a mental health program several times a week where she also received medications. (R. 209). He described Ms. Triplett as mumbling to herself, rocking, smiling for no reason, needing repeated instructions, and "in a world of her own." (R. 209).

On examination, Ms. Triplett appeared preoccupied and required frequent repeated instructions with answers often preceded by long pauses. (R. 210). She was distracted, mumbled

to herself, several times suddenly burst out in a loud laughter, and exhibited periodic noticeable rocking. Her speech was blunt and sparse with poor eye contact. Mood and affect were grossly intact. Although she gave her birth date correctly, she gave the current date incorrectly and did not know the who current president, Michael Jordan, or Michael Jackson were. She used her fingers when calculating and could perform simple addition but not subtraction. She could not perform serial sevens, could not respond to proverbs, and repeated two digits forward but zero digits backwards. If she were in a movie theater and there was a fire, she said she would hide. (R. 210).

Dr. Karr diagnosed psychotic disorder not otherwise specified with the need to rule out polysubstance use. (R. 211). He felt that both Ms. Triplett and her uncle were "limited informants of questionable reliability." He also felt Ms. Triplett presented quite idiosyncratically. (R. 211).

On January 9, 2010, Russell Taylor, Ph.D., reviewed the file for the state agency and concluded that Ms. Triplett had affective and substance disorders. (AR 212, 215, 220). He felt that, as a result, she had moderate limitations with activities of daily living; moderate difficulties in maintaining social functioning; and moderate difficulties in maintaining concentration, persistence, or pace. (R. 222). Dr. Taylor thought that Ms. Triplett had experienced one or two episodes of decompensation, each of extended duration. (R. 222). Dr. Taylor opined that Ms. Triplett had moderate limitations in her ability to: maintain attention and concentration for extended periods; sustain an ordinary routine without special supervision; complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; get along with co-workers or peers without distracting them or exhibiting behavioral extremes; respond appropriately to work setting changes; and set realistic goals or make plans. (R.

226-27).

He concluded that she retained the mental capacity to understand, remember, and concentrate well enough to perform simple tasks; she could tolerate a work setting with reduced social demands; and she could handle simple, routine change and work pressures. (R. 226).

The rest of the record consists of a series of brief notes – fifty pages or so – from Mr. Triplett's weekly visits with HRDI mental health professional Kate Aguar from January 2010 through March 2011. On January 13, 2010, Ms. Triplett displayed no signs of mental illness– her mood and affect were normal. (R. 318). She had no complaints the following week and was doing fine. (R. 317). On January 26th, Ms. Triplett said "she [was] doing very well . . . [was] not depressed and life [was] good." (R. 316). She was observed to be "mentally, emotionally, and physically stable." (R. 316).

On February 1, 2010, Ms. Triplett met with a different mental health professional at HRDI and the picture was drastically different. She had not taken her medication for two months. She complained of insomnia and forgetfulness, but no other symptoms. It was thought that her insomnia might have been due to her taking her Seroquel with Benadryl for two weeks. (R. 244). But, a couple of days later, meeting with Jerry Crockrell, Ms. Triplett said on a scale of 1 to 10, her mood was an 8, only because she had been up late the night before and was tired. (R. 315). Ms. Triplett remained stable and feeling good through March 1st. (R. 312-315).

Then, again, Ms. Triplett's story changed. On March 4, 2010, she said she was sad a lot, but had no hallucinations or suicidal ideation. (R. 245). She said she had a "sustained depressed mood." (R. 245). Not so the very next day, however, as she was "doing fine and taking her medications." (R. 310). In Mr. Crockrell's notes, she remained stable through the beginning of

June, with her medication doing a good job.  She was socializing with friends and family.  (R. 304).

She began to focus on getting a permanent place to live – she was living place to place – and getting

a job.  (R. 311-297).  There was not mention of any complaints or symptoms.  (R. 311-297).  But

in the other set of notes from HRDI, on April 23rd, Ms. Triplett reported that she met "the man" who

had molested her as a child and she had a setback and her auditory hallucinations returned.  (R. 245).

It's not clear what Ms. Triplett meant by this, as elsewhere in the record she claimed that she had

been molested by her brother and cousin.  (R. 237).

Back with Mr. Crockrell, on June 9th, Ms. Triplett said she was sad because she was having

trouble finding a job and a place to live, but she was able to cope with her emotions.  There were

no signs or symptoms of mental illness.  (R. 296).   Things continued in this vein in her meetings

with Mr. Crockrell through the beginning of September.  (R. 297-89).  She was frustrated with her

difficulty in finding a job and being accepted for housing programs, but she realized her criminal

past was an obstacle.  (R. 296).  She was at times tempted to go back to drugs, but was able to cope

and stay clean.  (R. 293, 295). She continued to socialize with friends – and make new ones – and

was able to control her anger that had hindered her relationships in the past.  (R. 292, 294).  She was

holding out very well and staying positive.  (R. 291).  She was able to cope with her situation

without drugs or alcohol.  (R. 290). However, totally contradictory notes from a different health

professional from the same period tell a tale of persisting auditory hallucinations, paranoia, and

constant checking of doors.  (R. 246),  Finally, in August, Ms. Triplett allowed to this second mental

health professional that she was "feeling a lot better.  (R. 247).  She was, however, very upset that

she was denied for medicaid in  September.  (R. 247).

In the positive set of notes, Ms. Triplett began meeting with Alicia Carter in September 2010.

It was much the same as it had been with Mr. Crockrell – she was doing okay, looking for work and a permanent place to live. She got some job interview tips. On November 18th, she got information on utilizing the resources available to her, the most important being Social Security and Health and Human Services. She was going to do everything she could "to get what she had coming." (R. 283). On November 23rd, she was successfully relieving her stress and depression. (R.280-88). On the other hand, in the negative set of notes, on November 8, 2010, Ms. Triplett reported hearing voices, being very depressed and paranoid, and experiencing a lot of stresses. (R 237). On mental status examination, she was said to exhibit: auditory hallucinations; illogical thinking with paranoia; motor behavior marked by moderate restlessness; decreased energy and concentration; impaired attention; signs of insomnia; an inability to perform serial sevens; distractability; and only fair insight, judgement, and reliability. (R. 238-39.) Her GAF score was 30 to 40. (R. 240).

On August 9, 2012, Jerry Crockrell, a mental health professional and Ms. Triplett's case manager, filled out a questionnaire her attorney had prepared. Mr. Crockrell noted that he saw Ms. Triplett about once a week, and had diagnosed her with schizoaffective disorder and related antisocial behavioral problems. (R. 230). He reported her highest GAF in the past year was 35. (AR 230). Mr. Crockrell ticked off a laundry list of Ms. Triplett's signs and symptoms: poor memory, sleep disturbance, personality change, mood disturbance, emotional lability, delusions or hallucinations, recurrent panic attacks, anhedonia or pervasive loss of interests, paranoia or inappropriate suspiciousness, difficulty thinking or concentrating, suicidal ideation or attempts, perceptual disturbances, time or place disorientation, grossly disorganized behavior, social withdrawal or isolation, blunt flat or inappropriate affect, decreased energy, and hostility or irritability. (R 230). She did not have a low IQ. (R. 231). He related his clinical findings as

depressed mood, paranoia, auditory hallucinations, and delusional thinking. (R. 231). Ms. Triplett was taking Seroquel, Trazadone, Lexapro, and Risperidal. (R. 231).

As for "Mental Abilities and Aptitude Needed to Do Unskilled Work," Mr. Crockrell felt Ms. Triplett had no more than a poor ability to: remember work like procedures, maintain attention for two hours segments, work in coordination or proximity to others without being unduly distracted, perform at a consistent pace without unreasonable number and length of rest periods, accept instructions and respond appropriately to criticism from supervisors, get along with co-workers or peers without unduly distracting them or exhibiting behavior extremes, respond appropriately to changes in a routine work setting, and deal with normal work stress. (R. 232). She has a fair ability to: understand and remember very short and simple instructions, carry out very short and simple instructions, maintain regular attendance and be punctual within customary usually strict tolerances, sustain an ordinary routine without special supervision, and be aware of normal work hazards and take appropriate precautions. (R. 232). In addition, Mr. Crockrell opined that Ms. Triplett's mental impairment imposed marked limitations in daily activities, and extreme difficulties in maintaining social functioning. Despite her fair ability to understand, remember and carry out simple instructions, he stated she had constant deficiencies in concentration, persistence, or pace. (R.. 233). Despite her fair ability to maintain attendance and punctuality, Mr. Crockrell felt she would miss more than three days of work every month. (R. 231). He also reported that Ms. Triplett had repeated episodes of decompensation due to her mental impairment. (R. 233). He added that her symptoms were unrelated to any ongoing drug or alcohol abuse. (R. 233).

### C.
### The Administrative Hearing Testimony

### 1.

## The Plaintiff's Testimony

Ms. King testified that her uncle drove her to the hearing. She had a driver's license at one time, but it was suspended. She could not recall why. (R. 46). She was never married, but did have four children. They were ages 24, 18 or 19, 15, and 12. (R. 47). She gave them to her grandmother, who still cares for two of them. The other two, she said, had "gone wherever they've gone." (R. 47). She hadn't worked in about four years, and was on food stamps and had a medical card and "$100 that they give you." (R. 49).

Ms. Triplett said she lived in her grandmother's basement. (R. 49). She had a microwave there and she prepared her meals with that. (R. 50). She kept her living space clean herself. (R. 50). She did her own laundry. (R. 51). Ms. Triplett explained that she didn't grocery shop because she didn't take buses any more. She claimed she got paranoid on the buses. (R. 52). She spent most of every day at the mental health clinic, from 8 a.m. until 2:30. (R. 52). She said she traveled to and from there in a bus or van. (R. 53). She saw a psychiatrist once a month and a case manager. (R. 53). The rest of the day, she watches TV. (R. 56).

Ms. Triplett said that she took four medications: Seroquel, Trazadone, Lexapro, and Risperdal. (R. 55). They cause side effects: dry mouth and pain in her stomach and legs sometimes. (R. 56). She began her treatment in 2009, when she began hallucinating and locked herself and her children inside for a week. (R. 57). That's when "they took them from [her]." (R. 58). Ms. Triplett added that she was in treatment for drugs, but the drugs weren't the reason they took her children. (R. 58). She had used heroin, but now was on methadone. (R. 59).

Ms. Triplett related that in the past, she threw a fan at her manager at work. When she was younger, she stabbed people. (R. 60). She said she was "worser" now. (R. 60).

**2.**
**The Vocational Expert's Testimony**

Ms. Hoiseth then testified as a vocational expert. The ALJ asked her to assume someone with Ms. Triplett's vocational background and who was unable to remember and carry out detailed or complex job instructions; could not perform work that required intense focus or concentration for extended periods; could only interact occasionally with the general public and have superficial or casual contact with coworkers; and could perform light work. (R. 61-62). Ms. Hoiseth testified that such an individual could perform work as a housekeeping cleaning (10,000 jobs); hand packager (15,000 jobs); and production assembler (1,000 jobs). (R. 62-63). The hand packager and assembler jobs did not allow an individual to be off task for more than ten percent of the time, while the housekeeping positions allowed an individual to be off task up to twenty percent of the time. (R. 63-64). Ms. Hoiseth stated that an individual generally could not be absent from work for more than one day monthly, and a new employee could not be absent more than two-thirds of a day. (R. 66). Ms. Triplett's attorney wondered what would happen if the individual were unable to have any public contact and only superficial contact with supervisors and co-workers, could not perform paced or production quota work, and needed an hourly reminder of their duties and to be refocused to those duties. Not surprisingly, Ms. Hoiseth testified that no jobs would be available. (R. 66-67). The same would be true if this individual were prone to anger outbursts. (R. 67).

**D.**
**The ALJ's Decision**

The ALJ found that Ms. Triplett suffered from the following severe impairments: affective disorder and obesity, and a history of substance abuse. (R. 28). The ALJ next determined that she

did not have an impairment or combination of impairments that met or equaled a listed impairment, specifically listing 12.04 for affective disorders.  (R. 29).  The ALJ determined that Ms. Triplett's psychological impairment resulted in only mild restrictions in daily living, and moderate restrictions in social functioning and concentration, persistence, and pace.  (R. 29).  There was no evidence she had experienced any episodes of decompensation that were of extended duration. (R. 29).

The ALJ went on to determine that Ms. King had the residual functional capacity to perform a full range of all work, except for that involving complex job instructions or intense focus and concentration for extended periods.  She could interact only occasionally with the public and could have only superficial contact with her coworkers.   Finally, she had to be allowed to be off task five percent of the workday.  (R. 30).  The ALJ weighed Ms. Triplett's allegation regarding her limitations against the medical record and found that she was not wholly credible.  (R. 31). Specifically, the ALJ reviewed at length the treatment notes from HRDI which indicated that she did well on her medication, and had improved to the point where she was looking for a job.  (R. 31). He also noted that Dr. Karr had found Ms. Triplett an unreliable informant regarding her condition. (R. 31).  The ALJ remarked that Ms. Triplett had lied about her past substance abuse.

The ALJ then addressed the questionnaire Mr. Crockrell filled out.  He found it to be inconsistent with the medical record and Mr. Crockrell's own treatment notes.  (R. 32).  And he found no evidence that Ms/ Triplett's obesity had any effect on her ability to perform the work the ALJ had described.  (R. 32).  Finally,  the ALJ  relied on the vocational expert's testimony to determine that Ms. Triplett could perform work that existed in significant numbers in the regional economy and, therefore, found her not disabled and not entitled to SSI under the Act.  (R. 33).

## IV.
## DISCUSSION

## A.
## The Standard of Review

The applicable standard of review of the Commissioner's decision is a familiar one. The court must affirm the decision if it is supported by substantial evidence. 42 U.S.C. §§ 405(g). Substantial evidence is such relevant evidence as a reasonable mind might accept to support a conclusion. *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008), *citing Richardson v. Perales*, 402 U.S. 389, 401 (1971). The court may not reweigh the evidence, or substitute its judgment for that of the ALJ. *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009); *Berger*, 516 F.3d at 544. Where conflicting evidence would allow reasonable minds to differ as to whether the claimant is disabled, it is the ALJ's responsibility to resolve those conflicts. *Elder v. Astrue*, 529 F.3d 408, (7th Cir. 2008); *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997). Conclusions of law are not entitled to such deference, however, so where the Commissioner commits an error of law, the court must reverse the decision regardless of the volume of evidence supporting the factual findings. *Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007).

While the standard of review is deferential, the court cannot act as a mere "rubber stamp" for the Commissioner's decision. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). An ALJ is required to "minimally articulate" the reasons for his decision. *Berger*, 516 F.3d at 544; *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). Although the ALJ need not address every piece of evidence, the ALJ cannot limit his discussion to only that evidence that supports his ultimate conclusion. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). The ALJ's decision must allow the court to assess the validity of his findings and afford the claimant a meaningful judicial review. *Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 698 (7th Cir. 2009). The Seventh Circuit calls this building a "logical bridge" between the evidence and the ALJ's conclusion. *Sarchet v. Chater*, 78

F.3d 305, 307 (7th Cir. 1996). It's also called a "lax" standard, *Berger*, 516 F.3d at 544.

## B.
### The Five-Step Sequential Analysis

The Social Security Regulations provide a five-step sequential inquiry to determine whether a plaintiff is disabled:

1) is the plaintiff currently unemployed;

2) does the plaintiff have a severe impairment;

3) does the plaintiff have an impairment that meets or equals one of the impairments listed as disabling in the Commissioner's regulations;

4) is the plaintiff unable to perform his past relevant work; and

5) is the plaintiff unable to perform any other work in the national economy?

20 C.F.R. §§ 404.1520; *Simila v. Astrue*, 573 F.3d 503, 512-13 (7th Cir. 2009); *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351-52 (7th Cir. 2005). An affirmative answer leads either to the next step or, on steps 3 and 5, to a finding that the claimant is disabled. 20 C.F.R. §416.920; *Briscoe*, 425 F.3d at 352; *Stein v. Sullivan,* 892 F.2d 43, 44 (7th Cir. 1990). A negative answer at any point, other than step 3, stops the inquiry and leads to a determination that the claimant is not disabled. 20 C.F.R. §404.1520; *Stein*, 892 F.2d at 44. The claimant bears the burden of proof through step four; if it is met, the burden shifts to the Commissioner at step five. *Briscoe*, 425 F.3d at 352, *Brewer v. Chater,* 103 F.3d 1384, 1391 (7th Cir. 1997).

## C.
### Analysis

Ms. Triplett's first problem with the decision is that the ALJ erred by selectively discussing

favorable evidence. She also claims he made numerous errors in his credibility assessment requiring remand. Finally, she argues that he did not properly address the medical opinion evidence and therefore as no supportable basis for his RFC finding.

**1.**

Ms. Triplett complains that the ALJ focused his attention on the positive treatment notes from HRDI, and did not address the few negative notes, especially from November 2010. It's not surprising that the ALJ focused on the notes, they make up the bulk of the record and cover Ms. Triplett's most recent treatment. They also provide a longitudinal record, giving a picture of Ms. Triplett's mental status on at least a weekly basis. If the ALJ hadn't focused on them, his opinion certainly wouldn't have born scrutiny.

It is true that an ALJ may not ignore entire lines of contrary evidence or selectively consider medical reports. *Myles v. Astrue,* 582 F.3d 672, 678 (7th Cir.2009); *Terry v. Astrue,* 580 F.3d 471, 477 (7th Cir.2009). And, a person with a mental illness will have better days and worse days, so a snapshot of any single moment says little about her overall condition. *Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011); *Larson v. Astrue,* 615 F.3d 744, 751 (7th Cir.2010); *Kangail v. Barnhart,* 454 F.3d 627, 629 (7th Cir.2006). But the ALJ here did not merely mine the record for a few isolated gems of good cheer. The notes from HRDI are a vein of consistent reports of mental stability without any complaints. Ms. Triplett's medication was working and, even in the face of personal setbacks that might once have tripped her up, she was coping well. Certainly, she was in dire financial straights and homeless due to past behavior – even she accepted that – but homelessness and a criminal record do not qualify one for SSI. There has to be a medical reason why she can't work. And, as the ALJ pointed out, the people treating her were grooming her for employment with

job hunting help and interview coaching. Why would they give a person dealing with mental illness such hope if they thought she was disabled. She'd be crushed and might never recover. That's not exactly the kind of results mental health professionals strive for.

The report from November 2010 is an outlier. It's not known who filled it out, but it was someone from HRDI. As is clear from the discussion of the medical evidence, it has nothing to do with the rest of the treatment notes. Ms. Triplett complains that the GAF score from that report means she couldn't possibly work. Well, the mental health care professionals that saw Ms. Triplett week in and week out from September 2009 through March 2011 obviously thought otherwise. GAF scores do not rule the day, *Carter v. Astrue*, 413 Fed.Appx. 899, 902, 2011 WL 917000, 2 (7th Cir. 2011); *Wilkins v. Barnhart*, 69 Fed.Appx. 775, 780, 2003 WL 21462579, 4 (7th Cir. 2003), especially when they sand in stark contrast to the great weight of the medical record.

Then Ms. Triplett commits a misstep herself, one that was referred to earlier. She takes the ALJ to task for stating that she was a heroine addict and failing to state that she was sober. (*Plaintiff's Brief*, at 10). As noted above, *supra at* 3 n.1, it is plaintiff's brief that misstates the evidence. Ms. Triplett may be in methadone treatment, but the record is clear that she is a heroine addict. Methadone is a narcotic. http://www.drugs.com/methadone.html. It can cause dependancy itself. http://www.narconon.org/ drug-information/heroin-methadone.html. She is not sober until she completes her methadone treatment. And she is a diagnosed as a heroine addict. (R. 205).

The ALJ may not have mentioned every piece of evidence in the record, but he was not required to. All he had to do was provide "an accurate and logical bridge" between the evidence and their conclusions. *Roddy v. Astrue*, 705 F.3d 631, 636 (7th Cir. 2013); *Craft v. Astrue,* 539 F.3d 668, 673 (7th Cir.2008). The longitudinal record of Ms. Triplett's condition in this case is such that the

ALJ didn't need to do much at all to meet this lax requirement. *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008); *Berger v. Astrue,* 516 F.3d 539, 545 (7th Cir.2008). Moreover, it's not as though he ignored the entire line of evidence that ran contrary to his conclusion. He addresses the May 2009 report, which was essentially identical to the November 2009 report, and discusses Mr. Crockrell's dire 2012 assessment of Ms. Triplett. But, as the ALJ clearly indicated, given the longitudinal record, these reports appear to be about a different person. The ALJ committed no reversible errors in his discussion of the record.

## 2.

From there, it is an easy segue into Ms. Triplett's complaints about how the ALJ assessed her credibility. She starts off with the inevitable argument that the ALJ employed a boilerplate phrase in his opinion, one that the Seventh Circuit repeatedly criticizes. *See Shauger v. Astrue*, 675 F.3d 690, 696 (7th Cir. 2012); *Bjornson v. Astrue*, 671 F.3d 640, 645 (7th Cir. 2012). The problem is, she completely ignores the case law that states that what really matters is whether the ALJ gave reasons for finding the plaintiff not credible. *Pepper v. Colvin*, 712 F.3d 351, 368 (7th Cir. 2013); *Filus v. Astrue*, 694 F.3d 863, 868 (7th Cir. 2012); *Shideler v. Astrue*, 688 F.3d 306, 312 (7th Cir. 2012). The ALJ gave reasons here and, incredibly, Ms. Triplett even acknowledges that he did *in the very next paragraph of her brief*, although she did not acknowledge all of them. (*Plaintiff's Brief*, at 19). This is becoming common practice for Ms. Triplett's counsel – meaningless boilerplate or hackneyed language, if you will. *See Orienti v. Astrue*, 2013 WL 4008719, *12-13 (N.D.Ill. 2013); *Patton v. Colvin*, 2013 WL 4024506, *3 n.3 (N.D.Ill. 2013). The argument has no place in a brief where the ALJ's decision does not call for it and, as such, it is unsupported by facts

or case law.  *See* Fed.R.Civ.P. 11(b).[3]

After that, Ms. Triplett's brief doesn't get any better.  She contends that the ALJ's sole reason for discrediting her allegations was the objective medical evidence.  (*Plaintiff's Brief*, at 19-20).  It wasn't; that's a mischaracterization of the ALJ's opinion.  Aside from the objective medical evidence, the ALJ was also concerned with Ms. Triplett's rather casual approach to the truth.  (R. 31-32).  Among other things, she lied about her history of substance abuse.  (R. 32, 208).  Her story was so inconsistent that, as the ALJ noted, the consultative examiner found her to be an unreliable informant.  (R. 31, 211).  It was entirely appropriate in this case for the ALJ to doubt Ms. Triplett's veracity.  *See Hamilton v. Colvin*, 2013 WL 1855725 *4 (7th Cir.2013)("Testimonial inconsistencies can indeed form the basis of an adverse credibility finding (citing SSR 96–7p)); *Wurst v. Colvin,* 2013 WL 1501941, 2 (7th Cir.2013)("Of course, lies and inconsistent statements provide a valid basis for finding a witness not credible."); *Rogers v. Barnhart*, 446 F.Supp.2d 828, 850-51 (N.D.Ill. 2006); *Henke v. Astrue,* 498 Fed.Appx. 636, 640, 2012 WL 6644201, *3 (7th Cir.2012); *Long–Gang Lin v. Holder,* 630 F.3d 536, 544 (7th Cir.2010); *Hill v. Astrue,* 295 Fed.Appx. 77, 81 (7th Cir. 2008).

Next, Ms. Triplett contends that it was improper for the ALJ to compare her allegations to the objective medical evidence.  But, the Seventh Circuit has repeatedly held that discrepancies between a plaintiff's allegations and the medical record are probative of exaggeration.  *Pepper v. Colvin*, 712 F.3d 351, 368-69 (7th Cir. 2013); *Schreiber v. Colvin,*  2013 WL 1224905, *9 (7th Cir. 2013); *Jones v. Astrue*, 623 F.3d 1155, 1161 (7th Cir. 2010); *Schmidt v. Astrue*, 496 F.3d 833, 844 (7th Cir. 2007); *Sienkiewicz v. Barnhart,* 409 F.3d 798, 804 (7th Cir.2005).  That was certainly the

---

[3] Ms. Triplett requested and was granted leave to file an oversized brief in this case.  (Dkt. #18,20).  As it turns out, it was ill-advised to have granted the motion, when the extra space was used to present misplaced and unsupported arguments.

case here, given the treatment notes from HRDI. It would have been improper for the ALJ *not* to have noted such glaring discrepancies.

Ms. Triplett also argues that the ALJ's failure to specifically recite and analyze each of the factors listed in SSR 96-7p mandates a remand. On the contrary, an ALJ is not required to recite, chapter and verse, those factors, and spend time analyzing each one specifically. *See Pepper*, 712 F.3d at 368 (upholding credibility finding based on medical evidence and daily activities); *Sawyer v. Colvin*, 512 Fed.Appx. 603, 608, 2013 WL 856509, *4 (7th Cir. 2013)(upholding credibility finding based on medical evidence and inconsistent statements); *McKinzey v. Astrue,* 641 F.3d 884, 891 (7th Cir. 2011)(upholding credibility determination based on medical evidence even where other two reasons were faulty); *Jones v. Astrue*, 623 F.3d 1155, 1161 (7th Cir. 2010)(upholding credibility determination, despite flaws, based on objective medical evidence). It is enough that he referenced SSR 96-7p and considered Ms. Triplett's allegations in light of it. (R. 30-32); *see Schmidt*, 496 F.3d at 843. Far from being "patently wrong," *see Pepper*, 712 F.3d at 368, the ALJ's discrediting of Ms. Triplett's allegations was all but dictated by the record.[4]

The elephant in the room, the one that Ms. Triplett and her attorney ignore – is the pattern of her wildly divergent descriptions of her mental state. When she needed help accessing various government resources like free housing or shelter, free medical treatment, and Social Security

---

[4] Ms. Triplett tosses in one other argument: she says that the ALJ couldn't mention the fact that the mental health care workers were grooming her for a job search because the ability to hold down a job is not proof positive of disability. (*Plaintiff's Brief*, at 19-20). She cites *Henderson v. Barnhart*, 349 F.3d 434, 435 (7th Cir. 2003), where the Seventh Circuit explained that a person might have a "careless or indulgent employer or be working beyond his capacity out of desperation." But Ms. Triplett isn't holding down a job, so it would be impossible to show that either of these things is the case. Moreover, Ms. Triplett alleges she became unable to work in 2008. Prior to that, she worked a little more than three years her entire life, not exactly indicative working beyond one's capacity. In any event, the ALJ did not reference this evidence to show Ms. Triplett could work, but that the people treating her thought she could.

benefits – things, as she put it, "she had coming" (R. 283), she was the healthy Ms. Triplett, working with the mental health professionals at HRDI on a weekly basis. She had no complaints, no symptoms, no auditory hallucinations. If she experienced setbacks or was sad, she coped. She socialized and made friends. When she applied for disability benefits – when she was sent for her consultative examination as part of the process, she was another Ms. Triplett altogether. She didn't know where she lived or how many children she had. She was hearing voices and rocking incessantly – there was no mention of either of these in the two years of clinical notes from HRDI. Of course, with the consultative examiner, she had incentive to exaggerate her symptoms. *Johnson v. Barnhart*, 449 F.3d 804, 805 (7th Cir. 2006).

**3.**

The longitudinal record also plays the lead role in the ALJ's treatment of the medical opinion evidence. Ms. Triplett complains that the ALJ improperly rejected the form Mr. Crockrell filled out in which he found her extremely limited in her capacity to work. The ALJ did so, as he stated, because this form had no basis, especially when one read through Mr. Crockrell's notes. (R. 32). Indeed, the assessment Mr. Crockrell gave in the form, has nothing to do with the observations he recorded over a several-month period of meeting with Ms. Triplett on a weekly basis. If Mr. Crockrell thought Ms. Triplett were the psychological cripple he depicted her to be, why would he not allude to it even once in two dozen meetings? (R. 289-312). No, the ALJ was entirely justified in rejecting Mr. Crockrell's questionnaire because it was unsupported by his own records. *Schmidt*, 496 F.3d at 842-43; *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004).[5]

---

[5] Failing that, Ms. Triplett submits that the ALJ had to recite and address the laundry list of factors
(continued...)

Ms. TRIPLETT also says that the ALJ ignore the other medical opinion in the record, that of state agency physician, Dr. Taylor. Far from ignoring it, a common-sense reading of the ALJ's opinion – and that is what the court is charged with giving it, *Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010); *Castile v. Astrue,* 617 F.3d 923, 928–29 (7th Cir.2010) – shows that he used it as the basis for his residual functional capacity ("RFC") finding. While the ALJ did not mention the state agency physician, the ALJ's RFC (R. 30) echoes the state agency physician's findings. (R. 226-27). For example, Ms. Triplett can't figure out how the ALJ came up with a moderate limitation in social functioning and interaction with co-workers, but no restriction on interaction with supervisors. (*Plaintiff's Brief*, at 14). But, it's right there in the state agency physician's assessment. (R. 227). She claims there is a record of her being unable to interact with supervisors, but the only such evidence is her own allegations. As the record demonstrates and the ALJ found, she's not a reliable witness. Another example of Ms. Triplett's nit-picking, as the Seventh Circuit has called it, *Schreiber v. Colvin*, 519 Fed.Appx. 951, 960, 2013 WL 1224905, 8 (7th Cir. 2013), is her problem with the ALJ finding she would be off task five percent of the time, and asks why she would not be off task twenty-five percent of the time. (*Plaintiff's Brief*, at 13). If she were, of course, she would be deemed unable to work. That would run counter to the findings of the state agency physician (R. 228), upon which the ALJ's RFC finding is based.

So, it's not as though he ignored the state agency physician's opinion, as did the ALJ in

---

[5](...continued)

applicable to the weight of a treating sources opinion listed in 20 CFR §416.927. She cites no Seventh Circuit authority for this requirement and that is not surprising. All an ALJ need do is minimally articulate his reasons for rejecting an opinion. He need not detail every reason, *Elder v. Astrue,* 529 F.3d 408, 415 (7th Cir.2008); *Berger v. Astrue,* 516 F.3d 539, 545 (7th Cir.2008), and he certainly need not engage in a *pro forma* incantation of the text of the regulation. *See Wurst v. Colvin*, 2013 WL 1501941, *3 (7th Cir. 2013); *Henke v. Astrue*, 498 Fed.App'x 636, 640 n.3 (7th Cir. 2012);,

*Parker v, Astrue*, 597 F.3d 920, 922 (7th Cir. 2010). What the ALJ did here provided enough of a logical bridge to his conclusion. A bridge sufficient to traverse a stream need not be the Golden Gate. Given this commonsense reading, there is no "evidentiary deficit" as Ms. Triplett claims. Indeed, it could be argued that, beyond the state agency physician's opinion, the forty-plus pages of clinical notes from the mental health professionals monitoring Ms. Triplett at HRDI support the ALJ's finding as well.

Finally, Ms. Triplett contends that the ALJ failed to make his finding that she had moderate limitations in concentration, persistence, or pace a part of his RFC finding. (*Plaintiff's Brief*, at 13). She cites case law holding that an ALJ may not account for such a deficit in his hypothetical to a vocational expert by simply limiting a plaintiff to unskilled work. *See, e.g., O'Connor-Spinner v. Astrue*, 627 F.3d 614, 620 (7th Cir. 2010)(limiting hypothetical to routine repetitive tasks with simple instructions did not account for deficiency of concentration, persistence, and pace); *Stewart v. Astrue,* 561 F.3d 679, 684–85 (7th Cir. 2009)(limiting hypothetical to simple, routine tasks did not account for limitations of concentration, persistence and pace); *Craft v. Astrue,* 539 F.3d 668, 677–78 (7th Cir.2008) (restricting hypothetical to unskilled work did not consider difficulties with memory, concentration or mood swings). But, in *O'Connor-Spinner*, the court acknowledged that it has never insisted specific terminology like "concentration, persistence, pace" be used in a hypothetical. *O'Connor-Spinner,* 627 F.3d at 619. Here, the ALJ did not use that exact phrase, but he did not use a stock limitation of "simple tasks" or "unskilled work" either. He used more specific limitations, like an inability to understand, remember, and carry out detailed instructions, or maintain intense focus or concentration. (R. 62). And significantly, the court also said that when the vocational expert has reviewed the record independently or heard testimony regarding the

plaintiff's limitation, that will suffice to show the VE's familiarity with those limitations despite any gaps in the ALJ's hypothetical. 627 F.3d at 619. Both of those exceptions are applicable here (R. 61), so if there was any deficiency in the ALJ's hypothetical – and, again, he went further than the ALJs in cases like *O'Connor-Spinner* – it does not require a remand.

## 4.

Handling an appeal of a denial of Social Security disability benefits should not be a conditioned reflex. Some ALJ denials should not be appealed. "About half the practice of a decent lawyer consists in telling would-be clients that they are damned fools and should stop." *Hill v. Norfolk and Western Ry. Co.*, 814 F.2d 1192, 1202 (7th Cir. 1987)(Posner, J)(quoting 1 Jessup, Elihu Root 133 (1938)). That advice is preferable to a brief that advocates for the overturn of an ALJ's decision by mischaracterizing evidence, ignoring the plaintiff's prevarications mischaracterizing portions of the ALJ's decision, and advancing boilerplate arguments that are unwarranted by the record, and are contrary to well-known Seventh Circuit precedent.

**CONCLUSION**

The plaintiff's motion for summary judgment or remand [#21] is DENIED, and the Commissioner's motion for summary judgment [#29] is GRANTED.


ENTERED: _____
UNITED STATES MAGISTRATE JUDGE


DATE: 11-25-13